DISTRICT OF OREGON
FILED
December 19, 2022
Clerk, U.S. Bankruptcy Court

Below is an opinion of the court.

DAVID W. HERCHER
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>**Jason Demitrius Georgedes**,<br><br>Debtor. | Case No. 21-61509-dwh7 |
| **Carol O'Neill,**<br><br>Plaintiff,<br><br>v.<br><br>**Jason Demitrius Georgedes** and **Church St Pizza**,<br><br>Defendants. | Adversary Proceeding No. 22-06001-dwh<br><br>**MEMORANDUM DECISION**[1] |

## I. Introduction

Carol O'Neill alleges that Jason Georgedes obtained nearly $30,000 from her by under the false pretense that he would use the money to pay

[1] This disposition is specific to this action. It may be cited for whatever persuasive value it may have.

contractors to repair her house, and he thus owes her a debt that's nondischargeable under 11 U.S.C. § 523(a)(2)(A).

Based on the evidence I heard at the trial, I find that O'Neill lent the money to Georgedes and that he was not required to use it to pay contractors. He thus did not obtain the money by false pretenses.

## II. Facts

### *A. Consistent testimony*

The parties testified without contradiction as follows:

In 2002, O'Neill started working at the State of Oregon's Department of Human Services. Georgedes was also working for the state, and she met him there. They both lived and worked in Salem, Oregon, and they were neighbors.

In the months leading to November 2011, O'Neill heard Georgedes mention at work that he had asked others to go in with him on the purchase of a pizza parlor. That month, she was 70 years of age and earned approximately $2,000 per month at her job. He was her boss.

O'Neill mentioned to Georgedes lots of things that she thought were wrong with her house, and he probably told her that the repairs sounded expensive.

On November 30, O'Neill and Georgedes signed an agreement stating the terms on which he would repay a $30,000 loan from her to him.[2] He was

[2] ECF No. 47, Trial (Tr.) Ex. A.

to pay her $28,000 no later than 90 days after he left his state employment. He was also to pay her monthly installments over not more than 18 months. The agreement says the loan was secured by the assets of Church St Pizza LLC, a limited liability company that he had formed to buy the restaurant's assets, Before paying the $28,000, he agreed to pay her the amount of the minimum payments on a home-equity loan on which she would draw the amount to lend to him. In addition to required interest and installment payments, he agreed that if the LLC were liquidated, he would pay her from asset-sale proceeds, and he would pay her 7 percent of the LLC's gross profits for the balance of her life. She signed the agreement after reading it in its entirety. The agreement says nothing about paying contractors to repair her house. It was notarized.

O'Neill drew $30,000 on a home-equity line of credit and arranged for her bank to issue a check for $29,995, which she gave to Georgedes. The $5 difference represented a fee her bank charged to issue that check. On December 1, he deposited the check into a credit union account in the name of the LLC. That day, the LLC drew $26,000 from its account to pay the restaurant seller.[3]

O'Neill thought the money "was gone the very night [she] gave him the money."

O'Neill bragged to friends that she was a co-owner of a pizza parlor.

---

[3] ECF No. 47 Tr. Ex. B at 1.

Georgedes made several payments on the loan, not including the $28,000 payment, before he defaulted. He filed his chapter 7 bankruptcy petition on September 15, 2021.[4]

### ***B. Conflicting testimony***

The parties' (and Georgedes's son's) testimony conflicted, or at least was not expressly consistent, on the following points:

O'Neill: Before November 2011, she had decided that she needed to get her house fixed to sell it. Her house needed repairs of the roof, gutters, plumbing, and floor. She and Georgedes had discussed both at work and at her house her need for the repairs, and he said he knew contractors whom she didn't know, and if she would give him the money, he would handle everything.

Georgedes: At work, O'Neill talked of actively seeking some sort of way to invest her money to earn interest. Before he decided to pursue the purchase of the restaurant, he had been trying to open a small food-service business, such as could be taken to the Saturday Market. They discussed the pizza opportunity at work for one to two months before she made the loan. They also discussed that the loan would enable him to buy equipment and intellectual property to operate the Church Street Pizza business. He expected to use his state retirement money, after leaving his state job, to pay O'Neill the $28,000.

---

[4] No. 21-61509 ECF No. 1.

Georgedes: His conversation with O'Neill in which she mentioned her need for house repairs was six months to a year before their discussions about the restaurant. She never asked him to arrange for contractors to repair her house, and he never agreed to do so. He never told her that he was talking to contractors. He had no contracting experience and didn't know contractors. His only experience hiring contractors was once hiring a contractor for a house where he lived. He has never helped anyone hire a contractor for any reason.

Georgedes: Within 90 days before November 30, at O'Neill's request, he helped her paint her laundry room or a section of the garage, about 10 feet square. It took about five to six hours on one day and a couple of hours on another day. He bit off more than he could chew. At that point, they were very far along in discussions about the pizza business. He enlisted the help of his son, Demitrius Georgedes, for the painting. No one else had ever paid Georgedes to do any contracting work, and he never held himself out as a contractor.

Demitrius: He never heard Georgedes talk about arranging contractors for O'Neill's house, but Georgedes told Demitrius that the purpose of O'Neill's loan was to buy the pizza business.

Georgedes: The agreement was signed on November 30, before she gave him the money that same day.

O'Neill: One day, or a few days, after she gave him the money, he asked if he could treat it as borrowed until he got his state retirement money, when he would pay that amount to her within a week or two. He said he wanted to use the money to buy a business. He first mentioned buying a pizza parlor "a day or two or three" after she gave him the money. She didn't intend to give him money for a pizza parlor, and she wouldn't have given him the money had he said he was going to use it for that purpose. She signed the agreement because he already had spent her money, and she had to get it back, "one way or another."

Georgedes: The restaurant expenses were quite high as he learned how to operate it. There were many unanticipated expenses for equipment replacement. He and O'Neill spoke daily at work, and she agreed with him that he should keep working at the state because the restaurant alone wouldn't sustain him for rent. He ended up staying in his state job longer than he had expected because he needed his salary to keep himself afloat. After he left that job, O'Neill came by the restaurant about once a week. They agreed that, because of problems with the equipment, he could use the money he otherwise would have used to pay her the $28,000 to replace equipment. He used his state retirement money to support the business. She agreed that he could do that as long as he could still make the payments on her home-equity loan. He made monthly payments under the agreement for about 12 to

18 months after she made the loan. After that, he was unable to continue to make payments.

## III. Analysis

### *A. Legal theory*

The cover sheet O'Neill filed with her complaint says that her claim arises under section 523(a)(2). In closing argument at trial, her lawyer explained that O'Neill's legal theory is that Georgedes' debt to her is nondischargeable under 523(a)(2)(A) because it was "a debt . . . for money . . . obtained by . . . false pretenses," And the supposedly false pretense was that he would use the money to pay contractors.

To establish nondischargeability under 523(a)(2)(A), a creditor must prove five elements:

> (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.[5]

### *B. The parties signed the loan agreement before O'Neill gave Georgedes the money.*

The parties' testimony about whether Georgedes promised to use the money to pay contractors is in direct conflict. If that testimony were the only evidence, I would be forced to resolve the conflict based only on the parties' demeanor while testifying. But I also have two documentary exhibits

---

[5] Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman), 234 F.3d 1081, 1085 (9th Cir. 2000).

admitted at trial—the written loan agreement and the LLC's credit-union statement.

Both parties dated the loan agreement November 30, 2011. The agreement displays a notary certificate that it was signed that day, and O'Neill does not dispute that she signed it then. She also does not dispute Georgedes's testimony that she gave him a check for $29,995 after receiving a bank-loan draw and paying a $5 bank fee. That check amount matches the amount of the LLC's credit-union deposit on December 1.

According to O'Neill, one to three days after she gave Georgedes the money, he asked to treat it as borrowed so he could use it to buy the restaurant. She didn't say when she advanced the money, either absolutely or in relation to when she signed the loan agreement. But his request to use the money for the restaurant purchase presumably would have preceded her assent to that request by signing the agreement on November 30.

If O'Neill had advanced the money one to three days before signing the loan agreement on November 30, the advance would have been between November 27 and 29, and Georgedes would have held the check two to four days before depositing it on December 1. I doubt that chronology for three reasons. First, she contradicted it by testifying that the money was "gone the very night [she] gave him the money"—meaning that she gave him the money no earlier than the day before he deposited it and disbursed most of it on the first. Second, a person holding a large check has an incentive to deposit it

sooner rather than later, and his story that he deposited the check the day after receiving it is more credible than hers that he held it two to four days before depositing it. Third, despite his clear testimony that she gave him the money after they had signed the agreement on the 30th, she offered no rebuttal evidence—including her own testimony or bank record—to show that she gave him the check no later than the 29th. I thus accept his testimony that she gave him the money after they had signed the agreement on the 30th.

Even if Georgedes had agreed before signing the loan agreement to use the money to pay contractors, O'Neill's acceptance of the agreement satisfied his original duty, creating a substituted contract discharging the original duty.[6] She read the agreement before signing it, and she offered no evidence that he misrepresented the purpose or effect of signing the agreement—that the money would be treated as a loan. Her statement that she signed the agreement to get her money back "one way or another" is consistent with her understanding that the written agreement contemplated a loan-repayment arrangement in which he would make prescribed installment payments in lieu of an obligation to use the money to pay contractors.

When O'Neill advanced the money, Georgedes's only operative representation was that he would repay the money as a loan on the terms of

---

[6] *See* Restatement (Second) of Contracts § 279 (1981), quoted with approval in Eagle Indus., Inc. v. Thompson, 900 P.2d 475, 481–82 (Or. 1995) (en banc).

the loan agreement. Because she advanced the money after signing the agreement, she could have justifiably relied only on his promise to repay the money as a loan—not on his prior, discharged promise to use it to pay contractors. She does not dispute that he intended to repay the money as a loan.

He did not obtain the money by false pretenses.

## IV. Conclusion

O'Neill has not carried her burden of proving that Georgedes's debt is for money obtained by false pretenses.

O'Neill's complaint, in the form of a letter filed when she was self-represented, names Church St Pizza as a second defendant. At trial, she did not advance a claim for relief against that entity. I will treat any claim against it as abandoned.

I will enter judgment that O'Neill's claim is dischargeable and dismissing this action against Church St Pizza.

###